STELLA ELLIOTT, Appellee, v. HARRIS R. TILL et al., Appellants.

No. 42797.

MARCH 5, 1935.

Kelly, Shuttleworth & McManus and Judson E. Piper, for appellants.

E. S. Tesdell and Harris M. Coggeshall, for appellee.

PARSONS, J.—Plaintiff in her petition claimed a homestead in lot 49, Chamberlain's addition to the city of Des Moines, and brought suit to enjoin the sale under an execution by defendant Keeling, sheriff, and against the defendant Till, the holder of the judgment against the plaintiff and others. The defendant Till claimed his judgment was a lien on the premises, and that the property was not the homestead of the plaintiff, and that the judgment was prior to the time the property became a homestead. In an amendment to the petition it was claimed the judgment was entered in 1930. The undisputed facts as shown by the abstract are that in 1913 the plaintiff and her husband built a home in Knoxville, Marion county, Iowa, and occupied it as a home until the fall of 1915, when they rented the home and removed to Des Moines on account of the condition of the parents of plaintiff. The husband was a traveling man and away from home a great deal. The mother and father of plaintiff were old and in ill health.

On moving to Des Moines, two rooms were reserved in the Knoxville home by the Elliotts, plaintiff and her husband, in which they stored their household goods left there. They attempted to sell the home in 1918, and later in that year did sell the same, for $5,250. There was a small mortgage of $1,400 on the place, and the sale was on time, and all the money that came in from the sale was left in a bank at Knoxville, in which one Wright was the cashier, to be invested for the Elliotts. The mother and father of plaintiff died in the fall of 1923. Whenever the Elliotts talked about getting a home, the mother would say: "We won't be here long; you just must not leave us."

The Des Moines home stood in the name of the plaintiff and was at 924 Forty-third street, which is lot 49 of Chamberlain's addition. The Elliotts were looking for a home prior to 1920; they bought the lot at 924 Forty-third street and commenced building May 1, 1924, and completed it in July, 1925, and the contract price for the building was $12,600, $7,000 being borrowed of a building and loan association, which money went into the home. Till's judgment was entered November 18, 1930. The note on which it was based was dated January 1, 1925. Judgment was for

$8,767.19 and costs, with eight per cent interest. Till bought in the property foreclosed on for $5,000. These are the record facts as shown by the practically undisputed testimony.

The first question arising in this case is,—Was there an abandonment by the Elliotts of their homestead at Knoxville? If it is shown there was none, the second question arising is,—Did the Elliotts in buying the lot at 924 Forty-third street acquire a homestead right therein?

Mrs. Elliott testified that when they removed to Des Moines it was a temporary arrangement, and that was the reason they stored their household goods; that they attempted to sell the homestead in Knoxville in 1918, and did sell it that fall. It was always in their mind that they would re-invest the money in a home; that as the money came in from the sale of the home it was put in a savings account with instructions that it be re-invested, and that these arrangements were made with Wright, cashier of the bank. The plaintiff's husband testified to the same arrangements, and that when they moved away from Knoxville they looked around for a home, thought maybe they might buy one if they saw something that suited them. That they got an attractive proposition for and sold the Knoxville home, and put the money from that sale in the hands of Wright to re-invest as they were going to establish a home with it; that it was fixed that at any time they wanted the money Wright would take their loan off their hands, and let them have the money for it. That when they wanted the money it had grown from the sale price to seven or eight thousand dollars. That they always had it in mind to use the Knoxville nest egg to build a home, and that soon after the death of the parents of plaintiff they used some of it to buy the lot, and borrowed from the building and loan association to build a home, and that in 1925 the home was finished.

The testimony of Mr. Wright and the correspondence fully corroborates the evidence of the Elliotts in reference to the keeping of the money, the investing of it by Wright, and the purpose they had in mind. In other words, the testimony sustains the claim of the Elliotts that it was their intention to sell the Knoxville home to get proceeds for a new home, and that the Knoxville proceeds were kept intact for that purpose. The evidence also shows that with these proceeds the lot for the new home was bought shortly after the death of the wife's parents, and it also shows all these

proceeds went into the new home, along with the money borrowed from the loan company for that purpose.

The plaintiff testified in regard to her arrangements with Mr. Wright:

"A great many times I said to Mr. Wright, 'Now you know what we have in mind, that we want to save this money for a new home; we want to add to it as fast as we can. You take the responsibility; you know what is good paper and what is not, and you put this money out to our best advantage'."

She also testified:

"Mr. Wright understood that we might decide at any time to buy or build and that we might need our money, and the understanding was (which you have letters to show) that if at any time we needed the money he would advance the money and take over our paper."

She also testified that the proceeds of the homestead sale were left intact until she bought the lot in Des Moines, and again testified:

"As soon as we knew we were going to buy, when we knew definitely we were going to buy, Mr. Wright sent us the money; he began to withdraw the papers just as fast as he could, turning over the money."

As to the payment of the amounts on the new home in Des Moines, Mrs. Elliott testified that the $5,537 paid on or about December 1, 1924, was all paid from the money which they had been gathering in from the loans which they had made with their homestead money.

Mr. Elliott, husband of plaintiff, testified as to making up their minds to sell the house at Knoxville:

"I don't know as we really did make up our mind. They came around and made us some offers that we thought at the time were pretty good, and we still didn't want to leave the old folks, so about, I suppose, the time when Mr. Brobst came up and made us a proposition that was attractive, that was how it came about that we sold."

He also testified that the amount of money obtained from Knoxville was between $7,500 and $8,000, and that the fund in the

Knoxville bank was established in the first place for the purpose of putting it into a home. So could it be said, in the face of the facts and the undisputed testimony, that the Elliotts ever abandoned their homestead rights in the Knoxville home, and especially could it be said bearing in mind the rights that the owner of a homestead has under section 10154 of the Code?

Southwick v. Strong, 218 Iowa 435, 255 N. W. 523, holds that the homestead character of a farm on which head of household had lived until four or five years before his death was not lost by the fact that he moved to town with his wife to be nearer physicians treating him, where he left his live stock and implements on the farm in care of a son, to whom he rented land, and intended to return as soon as he recovered, and never abandoned such intention.

Rand Lumber Co. v. Atkins, 116 Iowa 242, 89 N. W. 1104. In this case Atkins owned a homestead in Oskaloosa, Iowa; and in 1896 left the property and moved to Burlington, Iowa, where they lived until some time in 1899, then moved to Mt. Pleasant, where they then resided. Atkins voted three different times in Burlington, once "swearing in" his vote. He had said he was going to move to Burlington and live there in order that he might secure work, and was required to reside there in order to get the work. Atkins retained a room in his Oskaloosa home and left several articles of furniture there. His wife went with him to Burlington and to Mt. Pleasant. That he left Oskaloosa not with any thought of permanently abandoning the premises, although no time was fixed for returning. His wife did try to get work for him in Oskaloosa afterwards. In this case it was held that the lower court did right in holding that the home in Oskaloosa was not subject to judgments obtained after he left Oskaloosa in 1896. The judgments were obtained in 1898 and 1899.

Schaffner v. Campbell, 198 Iowa 43, 199 N. W. 334. Viola Campbell and James Campbell were husband and wife and were married in 1904. They purchased a property in Lehigh and the title was taken in the name of the husband, and they lived in it until August 18, 1918, when they moved temporarily, according to the testimony of Viola Campbell, to Fort Dodge, without any intention of abandoning the Lehigh homestead, and with the intention of returning to it. It was shown in the testimony that she said her husband thought she was very foolish to move to Fort Dodge, and she said she thought while things were quiet and there was nothing

moving it would be just as well to move to Fort Dodge and have the boy in school there. In December, 1918, a Fort Dodge bank obtained a judgment for $5,084, which was assigned to the plaintiff July 1, 1921, and on the same date obtained judgment against James Campbell for $3,500, both in the Webster district court, there being no judgment against Viola Campbell. Mr. and Mrs. Campbell had marital troubles after they moved to Fort Dodge, and on March 11, 1920, she filed suit for divorce, and in May, 1920, she contracted for the purchase of a house and lot in Fort Dodge, and received a deed for it in 1921. The divorce case was tried and decree entered in March, 1921, and Viola Campbell was awarded what the court in that decree called "the homestead property" at Lehigh, Iowa. In June, 1921, the appellant levied on the property at Lehigh. The plaintiff testified that she did not want to go back to Lehigh just then, and she purchased a property in Fort Dodge to live in, and that when they left Lehigh it was the intention to go back there to live when employment started. The effect of her testimony the court said was that there was no intention on her part, or that of her husband, to regard Fort Dodge as their permanent residence, or to abandon the Lehigh property as a homestead, and when they removed from Lehigh there was an intention to return, although no definite time was fixed when that should be. It appeared further in this case that in her petition for divorce, Viola Campbell set up that she and her husband were both residents of Wahkonsa township, Webster county, Iowa, and had been residents of such township in good faith for a period of two years. The circumstances most strongly relied upon by the appellant Schaffner was that in the petition for divorce the plaintiff recited what is herein just set out; also, that they could not have two homesteads; and that in her testimony the plaintiff referred to the Fort Dodge place as her residence—her home—her temporary home. These, with absence from the Lehigh homestead and occupancy of the Fort Dodge place, standing alone, would doubtless make a prima facie case, or raise a presumption, as some of the cases put it, which may be rebutted. They are not conclusive. They further point out in the opinion that the removal from the Lehigh property did not necessarily constitute an abandonment, and that if the abandonment was temporary and it was their intention to return at some future time, the length of the period being dependent on future conditions, then there was no abandonment. The lower court

in this case held that the judgments were not liens and that the Lehigh homestead was exempt.

It appears clear to us from the record that the plaintiff in leaving her home in Knoxville had no intention of permanently abandoning it; that she came to Des Moines for a temporary purpose; that the whole record shows her intention to return when that purpose was accomplished; also the fixed intention if the Knoxville home was sold the money realized therefrom should go into the purchase or building of a new home.

Section 10154 of the Code is as follows:

"New homestead exempt. Where there has been a change in the limits of the homestead, or a new homestead has been acquired with the proceeds of the old, the new homestead, to the extent in value of the old, is exempt from execution in all cases where the old or former one would have been."

This section gives to the owner of the homestead the right to change homesteads, and when a homestead is disposed of for the purpose of investing the proceeds in a new homestead the proceeds are exempt from execution, and there is reasonable time allowed to make the change.

State v. Geddis, 44 Iowa 537, was an attempt to subject the money derived from the sale of a homestead with which it was intended to buy a new one, and both the court below and the Supreme Court held it could not be done. The facts in this case were as follows: The defendant was the owner of 34 acres of land in Jasper county, Iowa, his legal homestead. He sold in October, 1872, to one Eberhart for the sum of $1,600, and took a mortgage for $1,400 on the purchase price. The purchaser failed to pay the notes and defendant foreclosed the mortgage, the premises were sold, and Eberhart, who gave the mortgage, redeemed by paying the money in to the clerk in March, 1875. On the same day garnishment was served on the clerk of the court on an execution on a judgment of the state of Iowa against Geddis, the judgment being entered that month, and the clerk retained in his hands enough to pay the judgment amounting to $675. The defendant had been a resident of Jasper county for some years and continued to reside there at the time of the commencement of the suit. He sold his homestead for the purpose of using the proceeds for the purchase of another home in Jasper county, and continued to so intend to do, and claimed

the money was exempt and not liable for the payment of the judgment. The court said that the only question presented was:

"Is the money, being the proceeds of the homestead, exempt from  *  *  *  judgment of the State against the defendant?"

It then cited the provisions of the Code in reference to the right to change homesteads, and said:

"Here is an absolute right given to exchange one homestead for another, or to sell the homestead and acquire a new one, which shall be exempt to the same extent as the former one."

The opinion then points out there is no prescribed method as to how this shall be done. That the statute does not provide that the sale must be for money which must be immediately invested in a homestead, saying, "We must give the statute a reasonable construction so as to effectuate its object." And further says: "But where the sale is made on a credit and with the intention of using the proceeds when collected in purchasing another homestead, and the proceeds are not put to any intervening use, they are exempt while thus in *transitu*  *  *  *  from the old homestead to the new." The court then says: "Any other rule would practically prohibit the changing of homesteads."

It also points out that the length of time intervening between the sale of the old and the acquiring of the new is not essentially a controlling circumstance. That the homestead statute must be liberally construed to effectuate its purpose, there is no question. This has been too often reiterated in courts to need any citation of authorities.

In the trial of the case below the court rendered an opinion in which he says, speaking of the Elliotts:

"It is the opinion of this court that they left said homestead in Knoxville intending to return and retained that intention until approximately the time they sold that home in 1918, and that they sold that home intending to re-invest the proceeds in another homestead. The time that intervened between the sale of the old and the purchase of the new homestead is explained by the illness of the plaintiff's mother and her protests against plaintiff purchasing a home which would result in plaintiff leaving the neighborhood in which the mother lived." The court further said in its opinion: "The investment of the funds temporarily in mortgages which the

bank agreed to at any time take off the hands of plaintiff is not such intervening use as to cause a loss of the exemption when viewed in the light of the extremely liberal construction given by our Supreme Court in such cases as Fardal v. Satre, 200 Iowa 1109, 206 N. W. 22; Harm v. Hale, 206 Iowa 920, 221 N. W. 582; Robinson v. Charleton, 104 Iowa 296, 73 N. W. 616; and cases cited in those opinions."

The plaintiff in this case purchased with the money the lot upon which the new house was built. From the moment this lot was bought it then became invested with the homestead character, even prior to the building of the house thereon.

In L. M. Mann v. Corrington, 93 Iowa 108, 61 N. W. 409, 57 Am. St. Rep. 256, in speaking of the taking of vacant property with the proceeds of the sale of a homestead, or in exchange for the homestead, with the purpose of it being used for a homestead, this court cited the case of State v. Geddis, 44 Iowa 537, herein-before discussed, and said, on page 113 of the opinion in 93 Iowa, 61 N. W. 409:

"We conclude that the homestead right may exist in vacant land for which a former homestead has been exchanged, or which has been purchased with the proceeds of such a homestead, when the land was thus obtained, and is held in good faith for use as a home. And the homestead character of the land will not be affected by the fact that it cannot be improved, and a dwelling house erected thereon, from the proceeds of a former homestead."

The lower court in its decree, considering all the testimony, fixed the value of the Des Moines homestead and property in question at $8,500, subject to a $2,700 mortgage, that being the balance left unpaid on the loan from the building and loan association, finding that the cash proceeds of the old homestead, plus interest, which went into the new homestead, was $5,046.57; and held that the new homestead was subject to execution for $753.43 with interest at six per cent from the entry of the decree on the 19th day of April, 1934, and provided that the plaintiff might pay into the court the sum of $753.43 with interest at six per cent within thirty days from the entry of the decree, and in default thereof execution might issue. The defendant Till appealed from this decision and decree. The plaintiff did not appeal, and therefore raises no question as to the right to set off the $1,400 mortgage on the Knoxville property

from the amount awarded Till, which might possibly have been done under a decision in the case of American Savings Bank of Marengo v. Willenbrock, 209 Iowa 250, 228 N. W. 295.

For the reasons pointed out the decision of the district court in this case is affirmed.

ANDERSON, C. J., and ALBERT, DONEGAN, RICHARDS, and KINT-ZINGER, JJ., concur.