## IN THE SUPREME COURT OF IOWA

No. 12–0800

Filed June 6, 2014

**IN THE MATTER OF THE ESTATE OF GLEN A. WATERMAN,** Deceased

**JINGLES TI-OKAY WATERMAN,**

Appellant.

---

Appeal from the Iowa District Court for Clayton County, Richard D. Stochl, Judge.

A surviving spouse appeals a district court ruling on her claim for recognition of her homestead interest in property sold by administrators of decedent's estate. **AFFIRMED AS MODIFIED AND REMANDED WITH INSTRUCTIONS.**

John W. Hofmeyer III, Oelwein, for appellant.

Alan T. Heavens of McClean, Heavens, & Vorwald Law Offices, Elkader, for intervenor-appellees.

Mary Jane White, Waukon, for former estate administrators-appellees.

**HECHT, Justice.**

The administrators of an estate listed residential real estate for sale. The decedent's common law spouse objected to the proposed sale of the property, contending the property was her home. The district court nonetheless authorized the sale of the property and the transaction was closed. The buyers took possession and made substantial improvements during the pendency of an appeal from the district court's order authorizing the sale. The court of appeals reversed the district court's order and remanded to the district court for consideration of the homestead interest of the surviving spouse.

The district court concluded on remand that the surviving spouse should, at her election, receive either the proceeds from the estate's sale of the real estate or the real estate itself upon payment to the buyers of a substantial part of the cost of the improvements made by them. In this second appeal, we must resolve the clash between the surviving spouse's homestead interest under Iowa Code chapter 561 and the interests of the buyers who claim the status of occupying claimants under Iowa Code chapter 560. We also address the surviving spouse's claim for loss of the rental value of the homestead for the period during which she was deprived of possession.

### I. Background Facts and Proceedings.

Jingles Waterman (formerly known as Debra Voss) began living with Glen Waterman in a house Glen owned in Mederville, Iowa, in March 2000. Glen passed away on May 10, 2008, leaving no will. Although Glen and Jingles had been longtime companions and had lived together for eight years, they had never married.

On May 20, the district court appointed Glen's parents, Verdeen and Loretta Waterman, as administrators of his estate.[1] On May 29, the administrators served Jingles with a notice to quit, which required her to vacate within thirty days the home she and Glen had shared for the previous eight years. Jingles complied with the notice, moving out in June, and the administrators moved into the home shortly thereafter.[2]

Jingles filed a claim in probate on October 10, seeking reimbursement for her "joint survivor ownership interest in assets of the estate" and a lien "for improvements made to the estate" while she and Glen had cohabited. She also filed a document stating she was Glen's surviving spouse and noting she would elect to take "her intestate share" of Glen's property. On November 6, the administrators filed notices disallowing these reimbursement and spousal election claims.

After hearings on Jingles's disputed claims, the district court determined in August 2009 that Jingles was Glen's common law spouse[3] at the time of his death and her property interests were therefore protected under Iowa Code section 633.211.[4] Under that provision,

---

[1]For convenience, we refer to Verdeen and Loretta collectively as "the administrators."

[2]The move out process involved significant strain between Jingles and the administrators, due in part to already strained relations and in part to personal property ownership disputes that persist today.

[3]This finding is not disputed by the parties and has not been appealed.

[4]Section 633.211 of the probate code provides:

> If the decedent dies intestate leaving a surviving spouse and leaving no issue or leaving issue all of whom are the issue of the surviving spouse, the surviving spouse shall receive the following share:
>
> 1. All the value of all the legal or equitable estates in real property possessed by the decedent at any time during the marriage, which have not been sold on execution or by other judicial sale, and to which the surviving spouse has made no relinquishment of right.
>
> 2. All personal property that, at the time of death, was, in the hands of the decedent as the head of a family, exempt from execution.

Jingles was entitled as Glen's surviving spouse to "[a]ll the value of all the legal or equitable estates in real property possessed by the decedent at any time during the marriage," that had "not been sold on execution or by other judicial sale," and to which she had "made no relinquishment of right." *See* Iowa Code § 633.211(1) (2007). In addition, Iowa Code section 561.11 granted Jingles, as Glen's surviving spouse, certain homestead rights, which allowed her to "continue to possess and occupy" the marital home until it was "otherwise disposed of according to law." *Id.* § 561.11.

Soon after the district court recognized her as Glen's common law spouse in August, Jingles expressed a desire to return to the marital home. By March 2010, however, the parties had failed to reach a resolution of Jingles's possessory interest in the homestead, and Jingles continued to live elsewhere. Frustrated with the estate's inattention to her claims, Jingles wrote a letter to the district court reporting no progress had been made in the months since the court's August 2009 ruling and informing the court the administrators had listed the home for sale in November 2009.

In early 2010, Daniel and Chasity Bushaw learned the administrators had listed the home for sale and became interested in purchasing it, despite their concerns about its condition and the possibility that Glen's former wife, Nancy, retained a property interest in the home. The Bushaws made an offer to purchase the home for the administrators' listed price of $20,000. The administrators filed a petition with the district court in April 2010 seeking approval of the

---

3. All other personal property of the decedent which is not necessary for the payment of debts and charges.

Iowa Code § 633.211 (2007).

proposed sale.[5]  The court held a hearing on the petition on May 4. Jingles attended the hearing without counsel.  The administrators contended the real estate should be sold to pay funeral bills, real estate taxes, and utility bills totaling in excess of $14,000.  Jingles objected to the sale, asserting the utility bills would not have been incurred by the administrators had they not evicted her from the residence.  The administrators presented evidence tending to prove the fair market value of the home was $20,000.

Based on the evidence presented at the hearing on the administrators' petition, the district court approved the sale of the residence to the Bushaws.  The Bushaws received a deed to the property on May 21 and took possession.

Jingles appealed the district court's order on June 4, contending the court erred in failing to recognize her homestead interest and in failing to prevent the administrators from engaging in self-dealing in their handling of the estate.[6]  Soon after taking possession, the Bushaws began making extensive improvements to the roof, septic system, plumbing, wiring, and other aspects of the property, at a cost of over $65,000.  An appraisal of the residential property—accounting for the Bushaws' improvements—assigned to the property a fair market value of only $41,000.

---

[5]The petition sought court approval of proposed sale of the home to the Bushaws for $20,000 and the sale of an uninhabitable storage building on a separate lot to the administrators for $4000.  The parties do not contest the ownership or possession of the storage building in this appeal.

[6]As the Bushaws were not parties in the estate proceedings at the time, there is no indication in the record tending to establish they received actual notice of Jingles's appeal from the order authorizing the sale.  We transferred the appeal to the court of appeals.

On June 15, Jingles filed an application requesting the administrators be required to post a bond in the amount of $100,000. The motion asserted Jingles had not waived the bond requirement as the estate's beneficiary and requested a court order requiring the bond as a condition of the administrators' continued service as administrators. A week later, Jingles filed a petition seeking removal of the administrators, asserting they were unsuitable under Iowa Code section 633.63(1)(*b*) because of their hostility toward her as the estate's sole beneficiary.

The district court entered an order on July 14, continuing the hearing on the application to remove administrators. The court noted that although the administrators had not objected to their removal, neither party had been able to identify a proposed successor. A successor was soon identified, however, and on July 29 an order approved by counsel for the administrators and counsel for Jingles was entered removing the administrators, ordering them to file a final report.

The administrators filed their final report on August 13, listing Jingles as the sole heir and beneficiary of the estate, and also listing the homestead as an asset sold during the administration. Jingles filed an objection to the final report, contending the sale of the home was in contravention of her homestead rights.

On March 7, 2011, the court of appeals reversed the district court order authorizing the sale of the home and remanded the case to the district court for consideration of Jingles's homestead interest in determining a proper disposition of the property. The former administrators filed an amended final report on March 21. Jingles again objected and requested payment of fair rental value for the time the administrators had wrongfully withheld possession.

The Bushaws' real estate agent, Owen Sylvester, notified the Bushaws of this development and informed them it might affect their

ownership interest in the home. Upon receiving this notice, the Bushaws stopped making improvements to the home. In April 2011, after Jingles served them with a notice to quit, the Bushaws filed an appearance in the estate and moved for a declaration they were the rightful possessors and owners of the property.[7] Jingles filed a "Statement of Position" on May 4, asserting her entitlement to "immediate possession of her homestead, and to reasonable rent for the time that she was wrongfully dispossessed."

Cross-motions for summary judgment were thereafter filed by Jingles and the Bushaws, each asserting entitlement to ownership and possession of the property. The motions were denied, however, and the district court held a hearing in April 2012 on the parties' competing interests in the real estate.[8] The Bushaws contended they were bona fide purchasers with no notice of Jingles's adverse interest, they had made improvements to the homestead property in good faith, and they were therefore occupying claimants under Iowa Code section 560.1. Jingles responded, asserting her homestead rights were superior to any interests of the Bushaws, the Bushaws were not occupying claimants under Iowa Code chapter 560 because they had not purchased the property from a true "judicial sale as required under Iowa Code section 560.2(1)," the Bushaws had not acted in good faith when purchasing the home and making their improvements, and she was entitled to rent for the period during which she had been wrongfully dispossessed of the property.

After an evidentiary hearing on the merits, the district court determined neither the Bushaws nor Jingles had "acted in bad faith" and

---

[7]In October 2011, the Bushaws formally intervened in the estate proceedings, asserting they were occupying claimants with rights under Iowa Code section 560.1.

[8]Although the court had appointed a new administrator by the time of the hearing, the former administrators appeared and were represented by counsel at the hearing.

"[n]either deserve[d] to suffer the inequity" of being ousted from the home or being saddled with the costs exceeding the appraised value of the home incurred by the Bushaws in making their improvements. The court therefore gave Jingles the option of taking possession of the home upon paying the Bushaws $53,500[9] as compensation for their improvements, or receiving $20,000—the purchase price of the unimproved home—from the estate in exchange for relinquishing to the Bushaws her ownership interest in the property. The court's order found the property had no rental value and therefore denied Jingles's damage claim for lost rent during the period she was wrongfully denied possession. Jingles appealed again and we retained the appeal.

**II. Scope of Review.**

We review probate matters tried in equity de novo. *In re Estate of Whalen*, 827 N.W.2d 184, 187 (Iowa 2013); *see also* Iowa R. App. P. 6.907. Although actions under Iowa Code chapter 560 "must be tried as in ordinary actions," *see* Iowa Code § 560.3, the district court and the parties expressly stated in the record their belief the trial of this matter was in equity. Thus our review of the facts in this case is de novo, in conformity with the manner in which the case was tried below. *See Molo Oil Co. v. City Of Dubuque*, 692 N.W.2d 686, 690 (Iowa 2005). Our review of the district court's interpretation of statutory provisions, however, is for correction of errors at law. *Whalen*, 827 N.W.2d at 187; *In re Estate of Myers*, 825 N.W.2d 1, 3–4 (Iowa 2012).

---

[9]The district court chose $53,500 based on its calculation of the midpoint between the total cost of the Bushaws' improvements and the postimprovement fair market value of the property.

### III. Discussion.

**A. Positions of the Parties.** Jingles first contends her homestead interest under Iowa Code chapter 561 is superior as a matter of law to any interest of the Bushaws as occupying claimants under chapter 560. As Glen's surviving spouse, Jingles posits she was entitled to "continue to possess and occupy" the marital home until it was "otherwise disposed of according to law." Iowa Code § 561.11. She contends that because the prior court of appeals decision in this case had the effect of voiding the sale to the Bushaws, the property has not been disposed of according to law, and she therefore remains entitled to immediate possession. Jingles further asserts a homestead is exempt from judicial sale, and she therefore cannot lawfully be deprived of her possessory interest or her ownership interest as a consequence of any judgment compensating occupying claimants for improvements. The district court judgment cannot stand, she posits, because it would effect an unauthorized judicial sale of her homestead. *See id.* § 561.16 (providing a homestead is "exempt from judicial sale where there is no special declaration of statute to the contrary"). The option allowed her under the district court ruling to retain the property if she pays the Bushaws $53,500 for their improvements, Jingles contends, amounts to a judicial sale because this record does not support a finding she is able to finance such a transaction.

Jingles insists the general assembly has made it abundantly clear the *only* special declarations of statute authorizing the sale of a homestead for the satisfaction of debts are found in Iowa Code section 561.21—a section making no reference to the claims of occupying claimants in its enumeration of the classes of debts for which a homestead may be sold at judicial sale. *See id.* § 561.21.

Jingles further urges the claim of the Bushaws cannot qualify as a debt "incurred for work done or material furnished exclusively for the improvement of the homestead" under Iowa Code section 561.21(3) because the improvements were not made with her knowledge or consent. *See id.* § 561.21(3). Emphasizing that the district court order authorizing the sale to the Bushaws was reversed by the court of appeals in the prior appeal, Jingles contends her homestead interest was not "disposed of according to law" and she is therefore entitled to "continue to possess and occupy the whole homestead." *See id.* § 561.11.

Even if this court were to reject her argument that homestead interests protected under chapter 561 are always superior to the claims of occupying claimants, Jingles argues the Bushaws are not entitled to protection as occupying claimants under Iowa Code chapter 560. First, Jingles maintains the Bushaws failed to establish color of title because they did not purchase the real estate at a "judicial sale." *See id.* § 560.1 (protecting occupants of real estate having color of title); *id.* § 560.2(1) (including purchasers at judicial or tax sales among those deemed to have color of title within the meaning of chapter 560). Second, Jingles contends the Bushaws failed to establish they occupied and improved the property in good faith as required by Iowa Code section 560.1 because they had notice of her adverse claim when they purchased and subsequently improved it.

The Bushaws contend there is no sound construction of chapters 560 and 561 precluding enforcement of their claims as occupying claimants under the circumstances presented here. Acknowledging chapter 561 controls *whether* a homestead may be sold to satisfy debts, the Bushaws posit that chapter 560 provides protection for occupying claimants making good faith improvements in the event the homestead *is*

sold, even if the sale itself is set aside after the improvements have been made. The Bushaws further assert the compensation owed to them for work done and materials furnished by them during their occupation exclusively for the improvement of the subject homestead clearly qualifies as a debt "incurred for work done or material furnished exclusively for the improvement of the homestead." *Id.* § 561.21(3). Accordingly, the Bushaws contend their claims as occupying claimants are neither inferior to, nor defeated by, Jingles's homestead interest.

The Bushaws further contend the administrators' sale of the home with court approval should be characterized as a judicial sale, and thus their purchase vested them with color of title under Iowa Code section 560.2(1). Even if the sale cannot be characterized as a judicial sale, however, the Bushaws contend they should be deemed to have occupied the property under color of title because Jingles knew they were in possession and making improvements, and she therefore implicitly consented to the improvements by failing to notify the Bushaws of her objections. Finally, the Bushaws assert they had no notice of Jingles's adverse claims, and therefore their purchase and improvements were made in good faith, as required by chapter 560.

### B. Overview of Relevant Statutory Provisions.

1. *Protection of the homestead interest.* The purpose of homestead statutes "is 'to provide a margin of safety to the family, not only for the benefit of the family, but for the public welfare and social benefit which accrues to the State by having families secure in their homes.' " *Brown v. Vonnahme*, 343 N.W.2d 445, 451 (Iowa 1984) (quoting *In re Marriage of Tierney*, 263 N.W.2d 533, 534 (Iowa 1978)). The general assembly has "chosen to provide special procedures to protect homestead rights, and has defined this protection in a comprehensive manner." *Martin v.*

*Martin*, 720 N.W.2d 732, 738 (Iowa 2006). Recognizing the important public purpose of the protections established for the homestead interest, we construe our homestead statute broadly and liberally to favor homestead owners. *In re Estate of Tolson*, 690 N.W.2d 680, 682 (Iowa 2005); *Elliott v. Till*, 219 Iowa 649, 656, 259 N.W. 460, 464 (1935); *Hunt, Hill & Betts v. Moore*, 219 Iowa 451, 453, 258 N.W. 114, 115 (1934).

Iowa Code chapter 561 protects the homestead interest of spouses through carefully crafted limitations on conveyances. *See* Iowa Code § 561.13. Applying the provisions of section 561.13, we have held the homestead statute invalidated a deed conveying a homestead from a son to his father when the son's wife did not join the conveyance, even though the son and his wife were separated and seeking a divorce. *Martin*, 720 N.W.2d at 738–39. Similarly, we recognized the homestead rights of a surviving spouse when her husband conveyed their homestead to a third party before his death without her assent. *Thayer v. Sherman*, 218 Iowa 451, 456–57, 255 N.W. 506, 509–10 (Iowa 1934).

In furtherance of its purpose of protecting the homestead interest, the general assembly has expressly limited the circumstances in which a homestead may be vulnerable to judicial sales for the satisfaction of debts. Section 561.16 generally provides "[t]he homestead of every person is exempt from judicial sale where there is no special declaration of statute to the contrary." Iowa Code § 561.16. Section 561.21— enumerating special declarations to the contrary—lists four classes of debt against which the homestead exemption from judicial sale must yield.[10]

---

[10]The four classes of debt recognized in section 561.21 are:

1. Those contracted prior to its acquisition, but then only to satisfy a deficiency remaining after exhausting the other property of the debtor, liable to execution;

We have previously prescribed a framework for analyzing homestead exemption claims asserted in the context of judicial sales. *In re Property Seized from Bly*, 456 N.W.2d 195, 198 (Iowa 1990). First, we must determine whether the challenged disposition of the homestead was a judicial sale "from which homestead property is generally exempt." *Id.* Although "judicial sale" is not defined in the Iowa Code, "[t]he term generally refers to a sale by authority of a court of competent jurisdiction, carried out by a person legally appointed and commissioned by the court for that purpose, and subject to confirmation by the court." *Id.*

In *Bly*, we noted "it is judicial participation which gives a sale the character of a judicial sale." *Id.* Yet, the meaning of the term is somewhat elastic in our homestead jurisprudence. We noted in *Bly* that one could fairly say "in the absence of statutory definition, the term 'judicial sale' is always given a meaning dependent upon the context in which it is used and the policies to be furthered or frustrated by the meaning assigned the term." *Id.* As illustration of that principle, we note we have held a judicial sale can occur even in the absence of actual court proceedings. *See id.* (citing *Sturdevant v. Norris*, 30 Iowa 65, 71–72 (1870) (nonjudicial foreclosure sale)); *Lucas v. Purdy*, 142 Iowa 359, 367–69, 120 N.W. 1063, 1066–67 (1909) (tax sale); *see also Stidger v. Evans*,

---

2. Those created by written contract by persons having the power to convey, expressly stipulating that it shall be liable, but then only for a deficiency remaining after exhausting all other property pledged by the same contract for the payment of the debt;

3. Those incurred for work done or material furnished exclusively for the improvement of the homestead; and

4. If there is no survivor or issue, for the payment of debts to which it might at that time be subjected if it had never been held as a homestead.

*Id.* § 561.21.

64 Iowa 91, 93, 19 N.W. 850, 851 (1884) (holding an assignment was a judicial sale though a court neither ordered the sale nor approved it). Indeed, we noted in *Bly* that although a forfeiture action did not technically result in "a sale" because the State paid no consideration, "the benevolent purposes of the homestead statute would be frustrated by giving the term 'judicial sale' . . . a narrow or technical construction dependent upon finding a true 'sale.'" *Bly*, 456 N.W.2d at 199. We have therefore broadly construed the term for purposes of chapter 561 as encompassing "any judicially compelled disposition of the homestead, whether denominated a 'sale' or not." *Id.*

Under the *Bly* framework, if a judicial sale of a homestead has occurred, the court must next determine whether it has been authorized by a "special declaration of statute." Iowa Code § 561.16. We turn to a brief overview of the occupying claimants' statute as we consider whether a judicial sale has occurred, and if so, whether it may have been authorized by the requisite special declaration.

2. *Protection of occupying claimants under chapter 560.* Under Iowa Code chapter 560, occupants of real estate with color of title who are later "adjudged not to be the owner" of the real estate may be compensated for the value of improvements they have made in good faith. *Id.* §§ 560.1, .4. Alternatively, if the true owner elects not to pay the value of the improvements and retake the property, the occupying claimant may pay the true owner "the value of the property exclusive of the improvements and take and retain the property together with the improvements." *Id.* § 560.4.

Occupants may establish color of title in this context if they have, among other statutory possibilities, purchased the property "in good faith

at any judicial or tax sale." Iowa Code § 560.2(1).[11] The purchaser at a judicial or tax sale made by a proper officer may be found to have acted in good faith regardless whether the officer had sufficient authority to make said sale "unless want of authority in such officer was known to the purchaser at the time of the sale." Iowa Code § 560.2(1). Thus, as long as occupying claimants have purchased in good faith, they may acquire color of title even at an unauthorized sale. *See Parsons v. Moses*, 16 Iowa 440, 442 (1864). Occupying claimants may also achieve color of title if, during an occupancy lasting less than five years, they have made valuable improvements to the land with the true owner's express or implied knowledge or consent. *See* Iowa Code § 560.2(3).

The rights of occupying claimants under Iowa Code chapter 560 are based on equitable principles of restitution. Although the statute provides protection for the interests of occupying claimants, we cannot adequately consider equitable issues of this kind solely by reference to the statute. As the Restatement (Third) of Restitution explains, "a problem of mistaken improvement cannot be comprehensively considered . . . without reference to the broader principles of restitution that the betterment acts incorporate." Restatement (Third) of Restitution & Unjust Enrichment § 10 cmt. *b*, at 113 (2011) [hereinafter Restatement

---

[11]At trial the Bushaws asserted they also had color of title under Iowa Code section 560.2(4), which deals with tax payments and owner reimbursements. They have not briefed that issue on appeal. We therefore deem this argument waived and need not consider it further here. *See Travelers Indem. Co. v. D.J. Franzen, Inc.*, 792 N.W.2d 242, 251 (Iowa 2010) ("Franzen has not asserted the timeliness issue on appeal. It is therefore waived."); *City of Asbury v. Iowa City Dev. Bd.*, 723 N.W.2d 188, 198 (Iowa 2006) ("Asbury failed to articulate this [due process] claim in its brief . . . . Accordingly, Asbury has waived this argument and we do not address it further."). We note occupants may also obtain color of title under the statute if they have occupied the property for five continuous years or if they have occupied the property under "state or federal law or contract." Iowa Code § 560.2(2), (5). Those alternatives are inapplicable here.

(Third) of Restitution]. Yet, we must be cautious in this inquiry, because "[t]hose who venture into the restitution thicket not infrequently become lost." *Snider v. Dunn*, 160 N.W.2d 619, 628 (Mich. Ct. App. 1968) (Levin, P.J., dissenting).

Examining applicable general principles of restitution, we note under the common law doctrine of accession, improvements made to real estate generally "lose their separate identity . . . and become a part of the land." Kelvin H. Dickinson, *Mistaken Improvers of Real Estate*, 64 N.C. L. Rev. 37, 38–39 (1985) [hereinafter Dickinson]; *see also Parsons*, 16 Iowa at 444 ("Improvements annexed to the freehold, the law deems part of it[.]"). If the improvements are made by someone who occupies land but is not the true owner, however, there exists a danger "the owner of the land may be enriched unjustly if the improver is ejected without requiring compensation from the owner." Dickinson, 64 N.C. L. Rev. at 39; *see also Read v. Howe*, 49 Iowa 65, 67 (1878) ("It is eminently proper that . . . the owner of the land [be] prevented from gaining what he has not paid for."). This danger is particularly acute when "the value of the improvements greatly exceeds the value of the unimproved property." Restatement (Third) of Restitution § 10 cmt. *a*, at 111. To avoid this danger of unjust enrichment, the Restatement explains, "effective relief to the improver may require subjecting the landowner to an involuntary exchange." *Id.*

**C. Analysis of the Application of the Homestead Protections and Occupying Claimants' Protections in This Case.** As we have already noted, we construe chapter 561—the homestead statute—broadly and liberally to favor homestead owners and protect homestead rights. *See Martin*, 720 N.W.2d at 738; *Tolson*, 690 N.W.2d at 682. Similarly, because chapter 560, the occupying claimants' statute, is based on

equitable principles, we also construe it broadly and liberally " 'so as to do, as far as possible under its provisions, complete justice between the parties.' " *Betz v. Sioux City*, 239 Iowa 95, 100, 30 N.W.2d 778, 780 (1948) (quoting *Stump v. Hornback*, 18 S.W. 37, 39 (Mo. 1891)); *see also Meyers v. Canutt*, 242 Iowa 692, 696–97, 46 N.W.2d 72, 75–76 (1951); *Benton v. Dumbarton Realty Co.*, 161 Iowa 600, 605, 143 N.W. 586, 588 (1913) (holding the occupying claimant provisions are "remedial in character [and] should be construed as to effectuate the objects intended"); Restatement (Third) of Restitution § 10 cmt. *a*, at 112 ("Modern decisions allow restitution for mistaken improvements more liberally than in the past because the tendency of modern law is to judge the equities between the parties on a case-by-case basis."). In *Meyers*, for example, we held an occupying claimant was entitled to compensation for valuable improvements, because allowing the true owner to reap the benefits at no cost would have been inequitable. 242 Iowa at 700, 46 N.W.2d at 77.

Both statutes were codified very early in Iowa's history. *See* Iowa Code § 1233 (1851) (occupying claimant); *id.* § 1245 (homestead). Both came before us in very early cases. *See Bridgman v. Wilcut*, 4 Greene 563, 565–66 (Iowa 1854) (discussing the enactment of the homestead exemption); *Wright v. Stevens*, 3 Greene 63, 65 (1851) ("[The occupying claimant statute] is an equitable statute. It is entitled to such a construction as will make it effective, and subservient to the object of its equitable provisions.").

With the foregoing legal principles in mind, we examine the competing interests of Jingles and the Bushaws here. We begin with the question of whether the district court's ruling on remand effected a

judicial sale in violation of Jingles's rights under chapter 561.[12]  The ruling gave Jingles a choice of alternative remedies.  The first alternative gave her the opportunity to accept $20,000—the sale proceeds paid by the Bushaws to the estate—in consideration for conveying title to the Bushaws.  If Jingles had rejected this cash option, the framework of the district court's ruling permitted an alternate choice, allowing her to retain ownership of the property and compensate the Bushaws for the improvements they made to the property.

We conclude we need not decide whether either or both of these alternatives effected a judicial sale under section 561.16 and this court's prior decisions applying it because, as more fully explained below, recognition of Jingles's homestead interest does not—as a matter of law—dispose of the Bushaws' interests as occupying claimants.  As noted, both statutes are to be construed broadly, and any dispute involving the occupying claimants must be analyzed with the occupying claimants'

---

[12]We note the right of homestead occupancy under Iowa Code section 561.11 is not of indefinite duration.  Rather, we have explained it is intended to be temporary.  *See Wadle v. Boston Market Co.*, 195 Iowa 46, 49–50, 191 N.W. 528, 529–30 (1923).  We have said:

> [T]he right to continue and occupy[] has its limitations, and ceases when the property is otherwise disposed of according to law, and it is so disposed of when the survivor elects to take a distributive share in the entire property of the deceased spouse.  On such election the right to continue in the occupancy of the homestead ceases.

*Voris v. West*, 180 Iowa 138, 142, 162 N.W. 836, 837 (1917).  Disposition according to law, in other words, may occur when a surviving spouse decides to take a share of the decedent's property.  Here, Jingles has done exactly that.  She claimed her intestacy share and the district court found in her favor in August 2009.  Under Iowa Code section 633.211, her intestacy share was the entire value of Glen's estate.  *See* Iowa Code § 633.211.  The August 2009 order therefore "otherwise disposed of [the property] according to law," vesting title in Jingles and ending her temporary right to occupancy under section 561.11.  *See* Iowa Code § 561.11 (providing that "setting off of the distributive share of the survivor in the real estate of the deceased shall be such a disposal of the homestead as is herein contemplated").  Jingles's right to occupy the home was thus made permanent under chapter 633 and succeeded her temporary right of possession under § 561.11.

statute's equitable origins in mind. Neither statute makes specific reference to the other, and extending appropriate protection to Jingles's homestead interest here need not require us to extinguish the Bushaws' interest as improvers. Thus, for purposes of our analysis, we assume, without deciding: (1) the district court order did effect a "judicial sale" as that term is defined for purposes of chapter 561, (2) no special declaration of statute authorized such sale, and (3) Jingles's homestead interest was therefore exempt from sale under section 561.16.[13] Having made these assumptions, we turn to the questions of whether and to what extent the Bushaws are entitled to protection under chapter 560 as occupying claimants.

The parties dispute whether the Bushaws established color of title through the purchase of the real estate at a judicial sale for purposes of chapter 560. *See* Iowa Code § 560.1 (protecting occupants of real estate having color of title); *id.* § 560.2 (including purchasers at judicial or tax sales among those deemed to have color of title within the meaning of chapter 560). We conclude the district court order authorizing the sale of the property to the Bushaws clearly resulted in a judicial sale within the meaning of section 560.2(1).[14] The Bushaws took possession only

---

[13]We reject the Bushaws' contention that they are owed a debt "for work done or material furnished exclusively for the improvement of the homestead." Iowa Code § 561.21(3). Section 561.21(3) surely cannot be read in a manner exposing the homestead to judicial sale for the value of improvements made without the consent of the owner after she has been wrongfully evicted from the property. The structure of chapter 561 supports our conclusion on this point. A homestead is defined as "the *house used as a home* by the owner." *Id.* § 561.1(1) (emphasis added). This usage suggests the homestead is *presently* used as a home by the owner; implying, in other words, that the owner is the person currently occupying the homestead. Given this framework, "the homestead" in section 561.21 must refer not only to the real property as a location, but also to the property's use.

[14]We reject, however, the Bushaws' assertion they made the improvements with Jingles's express or implied knowledge or consent. *See* Iowa Code § 560.2(3) (recognizing color of title of person who has occupied for fewer than five years if improvements are made with knowledge or consent of the real owner). Although Jingles

after receiving a court officer's deed from the administrators who had been granted authorization to make the conveyance. Yet, the imprimatur of the court's authorization of the purchase is not, standing alone, enough to bestow status as an occupying claimant under chapter 560. The Bushaws are entitled to protection as occupying claimants only if they acted in good faith both as to the purchase and in making the improvements. *Id.* §§ 560.1, .2(1).

"The good faith standard under the occupying claimant statute is a lesser standard of 'goodness' than that involved in bona fide purchaser status[.]" *Moser v. Thorp Sales Corp.*, 312 N.W.2d 881, 894 (Iowa 1981). "[W]e are not disposed to put upon the words *good faith*, as used in the statute, any technical construction. We think that they are to be taken in their ordinary acceptation." *Read*, 49 Iowa at 67–68. We note this conception of good faith under chapter 560 differs from the conception we have applied in the quiet title context. In quiet title scenarios, the good faith standard requires a purchaser to "show the purchase was made without either actual *or* constructive notice of existing rights in the property." *Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 638 (Iowa 1996) (emphasis added). By contrast, in the improvement context, the good faith standard has a different threshold. *See Moser*, 312 N.W.2d at 894; *Meyers*, 242 Iowa at 698, 46 N.W.2d at 76. Accommodation of this different threshold requires us to avoid defining good faith in this case with any "narrow or technical meaning," because "[t]o do so would not give to chapter 560 the broad and liberal interpretation we have held it should receive." *Meyers*, 242 Iowa at 698–

_____

knew the Bushaws were occupying the premises, she persistently objected to their occupancy and maintained she was the real owner whose homestead interest had been wrongfully invaded.

99, 46 N.W.2d at 76; *see also Read*, 49 Iowa at 67–68; Dickinson, 64 N.C. L. Rev. at 60 ("Carried to an extreme [a requirement that good faith improvers lack constructive notice] could eliminate most claims for mistaken improvement. . . . Fortunately, the courts have not been too literal or rigid in their application of these principles.").

Accordingly, we have said the good faith of occupying claimants is measured by "the actual, existing state of mind, whether so from ignorance, sophistry, or delusion, without regard to what it should be from given legal standards." *Meyers*, 242 Iowa at 698, 46 N.W.2d at 76; *accord Read*, 49 Iowa at 66 (concluding occupying claimants act in good faith if they have an honest belief and "had no actual notice of an adverse claim"). In other words, actual notice of a lack of authority precludes good faith; mere constructive notice does not. We further observed in *Read* that "if constructive notice of an adverse claim excludes good faith within the meaning of the statute, there would be *no* case in which an occupying claimant" could recover. *Id.* at 67 (emphasis added). The test for good faith in chapter 560 for occupying claimants is therefore clearly a subjective—not an objective—test. *See Sieg Co. v. Kelly*, 568 N.W.2d 794, 804 (Iowa 1997) (compiling various cases' definitions of good faith and including *Meyers* in the "subjective" category). As one authority has explained, "the improver must have an honest belief in his or her ownership of the land." Dickinson, 64 N.C. L. Rev. at 59; *see also Meyers*, 242 Iowa at 698, 46 N.W.2d at 76 (defining good faith in the improvement context to include only "the actual, existing state of mind"). Constructive notice cannot, therefore, negate an improver's good faith as it can for purported bona fide purchasers. *See* Restatement (Third) of Restitution § 10 cmt. *e*, at 116 ("Standing by itself, the fact that an appropriate search of the record would have disclosed the improver's

mistake does not automatically bar relief to the improver . . . . Knowledge, or what is often called 'actual notice,' is fatal to the improver's claim.").

Although the good faith test for occupying claimants is subjective, it does not permit a stubborn claimant to insist his genuine but clearly baseless belief entitles him to compensation. Instead, "[g]ood faith at least requires some reasonable basis for the belief" the improver has title. *Resnick v. City of Fort Madison*, 259 Iowa 578, 581, 145 N.W.2d 11, 13 (1966). In other words, reliance on naiveté will not constitute good faith. *Cf. Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wright*, 840 N.W.2d 295, 299–301 (Iowa 2013) (disciplining an attorney despite the fact he "honestly believed—and continues to believe—that one day a trunk full of . . . one hundred dollar bills" would appear at his office, in part because several documents of purported foreign origin, which were "facially of doubtful validity," formed the basis for his belief). We look to several factors as bases for good faith in other contexts, including, for example reliance on the advice of counsel, payment of taxes, and improvement of land at personal expense. *See City of Riverdale v. Diercks*, 806 N.W.2d 643, 657 (Iowa 2011) (advice of counsel); *Resnick*, 259 Iowa at 581, 145 N.W.2d at 13 (taxes); *Meyers*, 242 Iowa at 698–99, 46 N.W.2d at 76–77 (taxes and improvements). Here, as we have noted, the Bushaws relied on both the court's approval of the sale and an attorney's title opinion.

With respect to reliance on court approval, we note section 560.2(1) establishes color of title in a purchaser at judicial sale whether the officer authorizing or making the sale "had sufficient authority to make said sale or not, unless want of authority in such officer was known to the purchaser at the time of the sale." *Id.* § 560.2(1). Jingles contends the Bushaws cannot establish their good faith at the time of

their purchase under this standard because they had notice of her adverse claim. More specifically, Jingles asserts her presence at the court hearing on the proposed sale of the property and her objection to the sale constituted sufficient notice to the Bushaws of the administrators' lack of authority to sell the property. The record does not, however, establish the Bushaws were in the courtroom at the time of the hearing. Moreover, Jingles's objection to the sale could not, by itself, have established conclusively for purposes of notice that the administrators lacked authority. The district court, after all, had rejected her opposition and authorized the sale. Based on the court's approval of the sale, we believe, the Bushaws reasonably harbored a subjective belief the sale was valid. *See* Dickinson, 64 N.C. L. Rev. at 60 ("An improver who learns that he or she *definitely* is not the owner . . . should be denied recovery." (Emphasis added.)).

The Bushaws also cannot establish good faith, Jingles adds, because an appeal from the order authorizing the sale was pending when they obtained their deed. The Bushaws note the transaction closed on May 21, 2010, and Jingles did not file a notice of appeal until June 4.[15] We acknowledge the window for filing an appeal had not expired at the time the conveyance occurred, and we have previously explained "one cannot be a good-faith purchaser who relies upon a judgment or decree which is subject to appeal and reversal by a higher tribunal." *Rine v. Wagner*, 135 Iowa 626, 629–30, 113 N.W. 471, 472–73 (1907), *overruled on other grounds by Nat'l Bank of Burlington v. Huneke*, 250 Iowa 1030, 1037, 98 N.W.2d 7, 12 (1959). *Rine*, however, was a quiet title case, and as noted above, we may have good reason to diverge from straightforward

---

[15]The record does not indicate the notice of appeal was served on the Bushaws or their attorney, but the notice was of course public record as a court filing.

application of our quiet title principles in scenarios involving occupying claimants.

The Bushaws also "actively ignored signs and direct statements," Jingles contends, that would have alerted them to the administrators' lack of authority to sell the property. Among these signs and statements, she includes: her pro se letter to Judge Bauercamper in March 2010 complaining of the administrators' failure to relinquish possession of the property, a letter from Jingles's attorney to the Bushaws in March 2011 asserting the Bushaws were not bona fide purchasers for value, and several documents filed by Jingles's attorney between October 2011 and commencement of the trial in February 2012. With the exception of the pro se letter, however, none of these documents were created or filed until 2011 or 2012, well after the sale in May 2010. We cannot find, therefore, these documents would have alerted the Bushaws to the administrators' lack of authority at the time of their purchase. As for the March 2010 letter, we find no evidence tending to prove it was filed in the probate or that the Bushaws had actual knowledge of it.

Jingles also asserts the Bushaws must be deemed to have had knowledge of the selling officers' want of authority because agents representing the Bushaws in the real estate transaction had actual notice of Jingles's homestead interest. The agents with such knowledge, Jingles contends, were Ray Peterson, Dan Bushaw's step-father; Owen Sylvester, the Bushaws' realtor; and the attorney who prepared the title opinion for the Bushaws.

Jingles had, prior to the conveyance, informed Peterson of her opposition to the sale. Peterson acted as the Bushaws' agent, Jingles contends, because Peterson "saw Dan Bushaw 'every day during the week' and [was his] step-father and boss." We decline to find, however,

this recurring contact and familial relationship alone created an agency relationship. An agency relationship is not generally established in the absence of some indication by the principal to the agent "that the agent shall act on the principal's behalf and subject to the principal's control." Restatement (Third) of Agency § 1.01, at 17 (2006); *see also Peak v. Adams*, 799 N.W.2d 535, 546 n.2 (Iowa 2011).

Evaluating the record for evidence of an agency relationship between Peterson and the Bushaws, we note evidence indicates Peterson had informed Dan Bushaw the house was for sale. Peterson also testified he spoke on the telephone with Sylvester and suggested the Bushaws might be interested in buying the property, but there is no evidence supporting a finding the Bushaws had asked him to have this conversation. Similarly, although the record contains evidence suggesting Peterson contacted Jingles to inquire about the availability of the property, no evidence establishes he did so at the Bushaws' direction. Because we find no manifestation of the Bushaws' intent Peterson would act as their agent, we cannot conclude an agency relationship or authority arose in connection with the judicial sale, and we cannot conclude the Bushaws should be charged with Peterson's knowledge of Jingles's homestead interest or her related claim the officers selling the property lacked authority to sell it.

With respect to Sylvester, the Bushaws' realtor, we note his testimony indicated he knew of Jingles's objection to the sale given his presence at the hearing. His testimony also indicated, however, he had observed Judge Bauercamper approve the sale, and he had relayed to the Bushaws only the fact that the sale had been approved by the court. Similarly, the title attorney's title opinion prepared for the Bushaws in March 2010 does not mention Jingles's claim. And although the abstract

of title included an entry revealing the district court's determination in 2009 that Jingles was Glen's common law surviving spouse and was entitled to an interest in the estate pursuant to our probate laws, there is no evidence tending to prove the Bushaws had knowledge of this information at the time of conveyance. Thus, although the Bushaws' title may have been defective, we conclude their receipt of the court officer's deed to the property provided a reasonable basis for their good faith belief they had title. *See Resnick*, 259 Iowa at 580–82, 145 N.W.2d at 13–14 (finding, by contrast, no good faith where occupiers paid taxes on property but knew they "were paying rent to the city and recognized the right of the city to lease the land").

Jingles also argues Peterson, acting as the Bushaws' agent, had knowledge destroying the Bushaws' good faith during the period after the purchase in which they made their improvements. Jingles asserts, for example, Peterson "was also [the] Bushaws' agent in completing some of the improvements to the property," and that he knew of Jingles's adverse claim while performing in this capacity. But Peterson's assistance with and completion of improvements, we conclude, merely made him an employee or contractor for the purpose of completing those tasks—any agency relationship that may have arisen pertained to the construction. If an agency relationship developed on those facts, in other words, its scope was apparently limited to the purchase of materials and performance of construction work, and had no bearing on the Bushaws' color of title. *See, e.g., Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 100 (Iowa 2011) ("Logically, the scope of an agency relationship must have boundaries."). In a principal–agent relationship, the agent has authority only to "take action designated or implied in the principal's manifestations to the agent and acts necessary or incidental to achieving

the principal's objectives." Restatement (Third) of Agency § 2.02(1), at 89. Agents generally maintain a duty to act only within the scope of their authority. *Id.* § 8.09(1), at 354. Any knowledge Peterson possessed regarding Jingles's adverse claim was immaterial to his duty accruing as an agent at the time the improvements were being made—as it was at the time of the purchase. In short, we find no record evidence indicating the Bushaws were made aware, or should have been made aware, of the knowledge possessed by Peterson.

We therefore conclude the Bushaws were good faith purchasers at a judicial sale for purposes of chapter 560, entitling them to compensation for their improvements.[16] We turn to the determination of appropriate remedies.[17]

**D. Remedies.** As we have noted, the district court ruling gave Jingles the opportunity to choose between two alternatives: she could

---

[16]Having determined the Bushaws are occupying claimants entitled to protection under chapter 560, we need not decide whether they might be entitled to restitution for added value under a common law unjust enrichment theory. *See* Restatement (Third) of Restitution § 10, at 111; *id.* § 27, at 396–97; *see also McIntosh v. Borchers*, 266 N.W.2d 200, 203 (Neb. 1978). We note, however, the Restatement (Third) of Restitution contemplates a scenario much like the one presented here and concludes restitution should generally be available to the improver: "A builds a house on land purchased at a judicial sale from the estate of B. It is subsequently determined that the sale was altogether void and that [the property] belongs to C, B's devisee. B's estate has been dissolved. A has a claim in restitution against C." Restatement (Third) of Restitution § 10 cmt. *c*, illus. 1, at 115.

[17]Iowa Code section 560.4 provides as follows:

> The owner of the land may thereupon pay to the clerk of the court, for the benefit of the occupying claimant, the appraised value of the improvements and take the property and an execution may issue for the purpose of putting the owner of the land in possession thereof. Should the owner fail to make such payment within such reasonable time as the court may fix, the occupying claimant may pay to the clerk of the court, within such time as the court may fix, for the use of the owner of the land, the value of the property exclusive of the improvements and take and retain the property together with the improvements.

Iowa Code § 560.4.

accept $20,000 in consideration for the relinquishment of her ownership and possessory interests, or she could retain ownership and pay the Bushaws $53,500. We agree with Jingles that the district court erred in its formulation of the second alternative. Iowa Code section 560.4 grants the owner of improved land the option of paying the occupying claimant "the appraised value of the improvements." As the property had a value of $20,000 before the improvements were made, and an appraised value of $41,000 afterward, we conclude Jingles may retake possession upon payment to the clerk of district court in the amount of $21,000 less any credit to which she may be entitled from the Bushaws for rent during the period Jingles has been dispossessed. *See* Iowa Code § 560.4.

With respect to the question of rental credit,[18] we have previously examined similar questions in cases interpreting early versions of our occupying claimants' statute. *See, e.g., Childs v. Shower*, 18 Iowa 261, 274–75 (1865); *Dungan v. Von Puhl*, 8 Iowa 263, 271–72 (1859). In *Dungan* we explained:

> The owner is entitled to rents and profits according to the value of the land, for the purpose to which it is devoted by the occupant. The occupant is to pay what the use of the land is worth to him. In such a rule, we think, there will nothing be found inequitable. It does not require the occupant to pay rent on improvements made by himself. But it does require him to pay rent according to the increased adaptation of the land for the purpose for which it is used, though such adaptation has been brought about by the occupant's own labor. It is difficult to lay down a rule that will work alike fairly and equitably in all cases . . . . All that we can say is, that the occupant is to be charged for the rents, whatever the use of the property has been worth to him . . . .

---

[18]We note that while Jingles expressly asserted a claim for rent against the former administrators in the district court, the portion of her appeal brief requesting rent as relief makes specific reference only to rent due from the Bushaws. We address only that issue here and give no further consideration in this appeal to the question of what, if any, rent Jingles may be entitled to from the administrators.

. . . .

> Under our statute, the occupant of land under color of title, who is found not to be the rightful owner thereof, is to be paid for valuable improvements, made by him in good faith; and their value is to be ascertained by their worth at the time the appraisement is made. As resulting from this rule, we think he should not be charged with the rent of the improvements made by him, but should pay whatever the land has been worth to him.

*Dungan*, 8 Iowa at 269–71. The purpose for awarding rent, we recognize, is "to avoid undue prejudice to the owner" when the remedy for mistaken improvements "subjects the owner to a forced exchange." Restatement (Third) of Restitution § 10, at 111. Application of those principles here indicates Jingles is entitled to back rent for the period during which she has been excluded from the homestead.

Here, we note the district court has found the home had no rental value because it was in dire need of repair—"dirty, unke[m]pt and scattered with cobwebs," with slanted floors, an attic full of bat excrement, no functioning bathtub or shower, and no potable water. The district court declined to award Jingles a rent offset against the appraised value of the Bushaws' improvements as a result of these findings. Jingles contends, however, the district court's finding of no rental value was not supported by the evidence and asserts fair rental value should be assessed at $250 or $300 per month.

In other contexts, where property has been located adjacent to a nuisance, or has otherwise presented less than optimal occupancy conditions, we have generally concluded the property nevertheless has some nonzero rental value. *See, e.g.*, *Gacke v. Pork Xtra, L.L.C.*, 684 N.W.2d 168, 171, 185 (Iowa 2004) (explaining trial court could award diminished rental value for property located 1300 feet from hog confinement facilities); *Schlotfelt v. Vinton Farmers' Supply Co.*, 252 Iowa

1102, 1114–15, 109 N.W.2d 695, 701–02 (1961) (finding substantial evidence supporting property rental value of $90 per month in absence of nuisance, or $25 in presence of nuisance); *Franke v. Kelsheimer*, 180 Iowa 251, 259–60, 163 N.W. 239, 242–43 (1917) (concluding untillable farmland, which was "thickly covered with Russian thistles, cockleburs, and sunflowers" nevertheless had rental value of $1 an acre, while noting rental value would have been $5 or $6 per acre in the absence of those conditions). On the other hand, we have explained if the party seeking rent makes "no showing as to what the reasonable rental value was," there is no basis upon which damages can be established. *See Ditch v. Hess*, 292 N.W.2d 397, 398 (Iowa 1980).

At least one court has addressed the question of whether property in a state of deplorable disrepair may nevertheless retain some rental value. *See Simon v. Mock*, 331 S.E.2d 300, 302–03 (N.C. Ct. App. 1985). In *Simon*, the trial judge below had denied a rental claimant any recovery, on the ground the claimant had failed to adequately prove fair rental value, despite testimony supporting a rental value of about $150 a month. *See id.* The appellate court reversed, noting:

> While the trial judge had the authority to believe all, any or none of plaintiff's testimony . . . he did not have the authority to refuse to assign any rental value to the land at all. Even if the house on the property were fallen down or demolished, the land would still have a rental value. We do not believe that the judge reasonably could have inferred from defendant's evidence that the house was in such poor condition that the property had no value whatsoever.

*Id.* at 303. Although the *Simon* court did not convey much description of the house's condition, the analysis suggests real estate will generally retain some rental value, regardless the condition of the fixtures. *See id.*; *see also Laughlin v. Laughlin*, 229 P.3d 1002, 1007 (Alaska 2010) (upholding, in divorce case, lower rental value for marital home based on

state of significant disrepair, but concluding value was to be reduced rather than eliminated).

In the habitability context, courts have also ordered rent amounts reduced—but not eliminated—when dwellings are in very poor condition. *See, e.g., Berzito v. Gambino*, 308 A.2d 17, 18–19, 21, 24 (N.J. 1973) (reinstating a trial court's determination that a property's rental value was $75/month despite findings that the "screens and storm windows were either broken or missing, a number of windows were boarded up where the panes had been broken, several radiators were not to be found, there were holes in the floors and wall, plaster was falling, several electric fixtures were inoperable, there was a sewage backup in the cellar and the premises were infested with roaches and rodents"); *C.F. Seabrook Co. v. Beck*, 417 A.2d 89, 91–92, 99 (N.J. Super. Ct. App. Div. 1980) (examining whether rental value of $75/month was inappropriately low, despite "sewage problem[s], drainage problems, exposed wires and rotted wood in the foundation"); *Samuelson v. Quinones*, 291 A.2d 580, 581, 583 (N.J. Super. Ct. App. Div. 1972) (per curiam) (approving rental value of $60/month for a property with "defective conditions relating to the gas range [and] kitchen sink, pipe leakage, broken window[s], cracked walls, [a] hanging bathroom door, [and] cracked and chipped plaster").

Based on these principles, we find Jingles is entitled to rent from the Bushaws at the same rate of $250 per month for the period beginning when they took possession of the property and running until they pay Jingles the value of the property exclusive of the improvements, or until Jingles pays the Bushaws the appraised value of the improvements less any rental value. This finding allocates to Jingles the rental value of the property as it existed before the Bushaws began improving it. The finding is consistent with the proposition that

occupants of land under color of title "should not be charged with the rent of the improvements made by [them], but should pay whatever the land has been worth to him." *Dungan*, 8 Iowa at 271–72; *see also Childs v. Shower*, 18 Iowa 261, 274–75 (1865). Although we recognize this may appear a harsh remedy, we believe the Bushaws are not left without other prospects for remedy, as they may assert claims against any persons having legal responsibility for their damages.

**IV. Conclusion.**

We therefore affirm as modified the district court's ruling and remand with instructions. The district court shall enter judgment as provided by one of the following formulas: (1) If Jingles elects not to pay the Bushaws the appraised value of the improvements and elects instead to transfer title to the Bushaws, the amount of the judgment in her favor against the estate and the Bushaws shall be determined by adding the sum of $20,000 plus the sum of $250 per month times the number of months from the date of the conveyance by the estate to the Bushaws until the date of judgment; or (2) If Jingles elects to retain the property and pay the Bushaws the appraised value of the improvements, the value of the judgment against Jingles shall be determined by subtracting from $21,000 the amount of $250 per month multiplied by the number of months having elapsed since the conveyance from the estate to the Bushaws. The costs of this appeal shall be taxed one-half to Jingles and one-half to the Bushaws.

**AFFIRMED AS MODIFIED AND REMANDED WITH INSTRUCTIONS**.